UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Crim. No.  20cr10197-LTS |
| ) | |
| JOSHUA TEIXEIRA, ) | |
| ) | |
| Defendant. ) | |

### SENTENCING MEMORANDUM

Defendant Joshua "Trouble" Teixeira was an active and central member of the NOB gang.  Defendant personally committed various gang-related crimes, including an attempted murder in rival gang territory in 2018.  Additionally, Defendant planned and supported other gang-related crimes, as well as the NOB gang itself.  Given all of the circumstances of this case, the Government recommends a sentence of 97 months' incarceration to be followed by 3 years of supervised release, no fine and a $200 mandatory special assessment.

The Government's proposed sentence reflects the low-end of the applicable Sentencing Guidelines range as set forth in the PSR.  The range is based primarily on the 2018 attempted murder committed by Defendant.  No reduction below the applicable Guidelines sentencing range set forth in the PSR is appropriate in this case.  Defendant's own crimes and his active involvement in, and promotion of, the NOB gang mandate the recommended sentence.  In this regard, Defendant's and the gang's criminal activities caused widespread injury to various victims and the public in general.  The people harmed by Defendant include not only the people that he personally targeted, but also the people harmed by the actions of NOB - the criminal organization that he actively promoted.  As set forth in pleadings already filed in this case, and

1

the factual summary in Exhibit 1 attached hereto[1], the NOB gang's criminal activities harmed numerous victims through violent crimes (including murders, shootings, robberies and assaults), drug trafficking (particularly the trafficking of fentanyl[2]), and sex trafficking activities.[3]  NOB's actions also contributed to increased gang-related violence that plagued the Dorchester area of Boston, as well as other communities.

---

[1] The government submits that the entirety of the information concerning NOB provided to Probation in the Omnibus Statement of Facts and Addendum (attached hereto as Exhibit 1) should be considered by the Court in determining an appropriate sentence, especially since Defendant pled guilty to RICO conspiracy.  USSG § 1B1.4; 18 U.S.C. § 3661.  Section 3661 of Title 18 "codifies the longstanding principle that sentencing courts have broad discretion to consider various kinds of information." *United States v. Watts*, 510 U.S. 148, 151 (1997) (per curiam).  Congress has expressly provided that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.  The Sentencing Guidelines, in turn, expressly incorporate § 3661: "[i]n determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character, and conduct of the defendant, unless otherwise prohibited by law. See 18 U.S.C. § 3661." USSG § 1B1.4 (emphasis added). "Both Congress and the Sentencing Commission thus expressly preserved the traditional discretion of sentencing courts to 'conduct an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come.'" *Pepper v. United States*, 562 U.S. 476, 487–89 (2011) (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972)); *see also id.* at 490–91 ("Congress could not have been clearer in directing that '[n]o limitation…be placed on the information concerning the background, character, and conduct of a defendant that a district court may 'receive and consider for the purpose of imposing an appropriate sentence' . . . We have recognized that 'the broad language of 3661' does not provide 'any basis for the courts to invent a blanket prohibition against considering certain types of evidence at sentencing.'" (quoting § 3661 and *Watts*, 519 U.S. at 152)).

[2] One aspect of the gang's fentanyl trafficking was the distribution of pressed fentanyl pills which were manufactured to appear as oxycodone pills.  Fentanyl is a far more powerful drug than oxycodone, while oxycodone is a more expensive drug on the street.  Thus, beyond the inherent danger of opioid abuse, by placing these false oxycodone pills into circulation on the street, the gang placed unwary users at risk of taking fentanyl instead of the expected oxycodone.

[3] Numerous NOB members/associates were involved in the trafficking of women, including Moses "Moe" Cabral, Damian Cortez, Delven "Delly" Carvalho-Centeio and Samael "Hamma" Mathieu.

The Government's recommendation of a 97-month sentence of incarceration aligns with the factors set forth in 18 U.S.C. § 3553. In particular, the sentence is necessary to protect the public and to deter both Defendant and others from similar criminal conduct in the future.

**The Sentencing Guidelines**

The Government agrees with Probation that Defendant's applicable Sentencing Guidelines are driven by the May 17, 2018, attempted murder committed by Defendant. *See* PSR at ¶¶ 16-19; 84. Defendant, along with two other NOB members/associates (including Anthony "Ant" Depina[4]), drove into rival Cameron street gang territory in Dorchester during ongoing hostilities between the gangs – these hostilities resulted in numerous shootings and murders which both predated and postdated this shooting. *See* Exhibit 2 (a brief summary of some of the violence committed during this conflict). Defendant was armed with a 9mm handgun. After Defendant and his two cohorts pulled up near a group of people, Defendant fired at least six shots at the group. At least two individuals from the group returned fire and wounded both Defendant and NOB member/associate Anthony Depina. This exchange of gunfire occurred at approximately 9 p.m. in a residential neighborhood. Defendant's actions endangered not only the specific people who were targeted, but also innocent individuals who lived in that neighborhood. Multiple shots were fired from three different shooters – any of these shots could have struck an innocent bystander on the street or in nearby residences. Moreover, this shooting

---

[4] Anthony Depina was involved in a separate NOB-related shooting that took place in October 2016 at the campus of the University of Massachusetts, Dartmouth, involving NOB member Darius Bass, as well as trafficking both drugs and firearms pursuant to his association with NOB. Depina also rented an apartment in North Attleboro from which officers seized approximately a kilogram of fentanyl (including thousands of blue fentanyl pills) and a commercial pill press in 2020.

was part of the ongoing gang conflict between NOB and the Cameron street gang which produced a climate of fear in the Dorchester neighborhood through the constant potential for random violence as gang members/associates attacked each other without regard to the safety of those around them.

Defendant objects to Probation's finding that the shooting satisfies the requirements for attempted murder pursuant to U.S.S.G. § 2A2.1. Defendant argues that the facts set forth in the PSR support a charge of involuntary manslaughter under Massachusetts state law rather than attempted murder. Defendant claims that the "circumstances here reflect reckless conduct sufficient to cause death." Thus, Defendant appears to argue that three NOB members/associates traveling to rival gang territory with a loaded 9mm handgun, pulling over by a group of people and firing at least six shots at the group of people was an unplanned, reckless act. Defendant's argument fails and the Guidelines found by Probation are appropriate.

Massachusetts state law does not control this determination. Application Note 1 to Section 2A2.1 specifically references federal law being the appropriate law to apply. *See, e.g., United States v. Turnipseed*, 2022 WL 3754708 at *4 (7th Cir. Aug. 30, 2022) ("the guideline points to the federal murder statute, 18 U.S.C. § 1111(a)"). "The federal murder statute defines murder as 'the unlawful killing of a human being with malice aforethought.'" *Id*. To qualify as a first-degree murder, the act requires premeditation. *Id*. Thus, pursuant to a preponderance standard, the facts must support that Defendant acted with premeditation and that he had the requisite intent to kill on May 17, 2018. *Id*.

"'Although it is clear that deliberation and premeditation under § 1111 involve a prior design to commit murder, no particular period of time is necessary for such deliberation and

premeditation.' … 'It must be long enough for the killer, after forming the intent to kill, to be fully conscious of that intent.'" *United States v. Chambers*, 719 Fed.Appx. 246, 248 (4th Cir. Mar. 15, 2018) (citations omitted). "'[I]n establishing premeditation the government [is] not required to show the defendant deliberated for any particular length of time ….'" *United States v. Wilson*, 992 F.2d 156, 158 (8th Cir. 1993) (citations omitted). Premeditation "'does not require the lapse of days or hours, or even minutes.' … Rather, 'it is the fact of deliberation, of second thought that is important.'" *United States v. Watson*, 2021 WL 2474430 at *6 (E.D.N.Y. June 16, 2021) (citations omitted). In *Wilson*, the Eight Circuit found:

> The district court focused on Wilson's actions prior to the shooting to support its finding of premeditation and deliberation. The district court noted that Wilson got into a car with two men who had just been involved in a shooting. He was either armed when he entered the car, or given a weapon by one of the others. Then, Wilson fired a shotgun out of the passenger's window of the car towards a group of people. …. This evidence supports the district court's finding of premeditation and deliberation.

992 F.2d at 158. In a similar vein, the Sixth Circuit has noted: "We have previously found premeditation where a defendant went to retrieve a gun before finding the potential victim and then pointing the gun at the victim and firing." *United States v. Bradford*, 822 Fed.Appx. 335, 339 (6th Cir. July 30, 2020).

There is clearly sufficient evidence to support that Defendant's actions were premeditated based on the following:

1. At the time of the shooting, Defendant and NOB were in an ongoing gang war with the Cameron street gang that had resulted in multiple shootings and murders. Some of these acts of violence between the two gangs are set forth in Exhibit 2. In this vein, in the months leading up to May 17, 2018, Defendant's close NOB associate Ricky Pina had been shot and two other NOB members/associates (J.D. and N.G.)

5

had been shot and murdered under circumstances tying these incidents to the conflict between NOB and the Cameron street gang;

2. Defendant and the other two NOB members/associates drove into Cameron street gang territory. This action placed all three at significant physical risk of being immediately attacked, including being shot. The decision to enter an armed rival's neighborhood was highly dangerous. The danger inherent in their driving into Cameron territory is aptly demonstrated by the fact that both Defendant and Anthony Depina were shot during the incident. The only reason for such an action was for Defendant and the others to carry out yet another gang-related shooting;

3. Defendant and the two other members were armed with at least one handgun when they drove into Cameron territory –confirming that they were on a mission targeting their rival gang for a shooting;

4. Defendant and the other two NOB members/associates then *chose* to pull over and stop near a group of individuals; and

5. Defendant thereafter engaged in a shooting where he fired multiple shots at the group – culminating their mission to attack their rival gang.

Defendant's actions were a planned attack on the members/associates of the Cameron street gang consistent with the ongoing hostilities and shootings between the gangs. Defendant's actions were clearly premeditated. *See, e.g., United States v. Mays*, 285 Fed.Appx. 269, 273-74 (6th Cir. Aug. 1, 2008) (premeditated attempted murder where gang members armed themselves, traveled to a rival gang's clubhouse where there appeared to be at least one gang member inside, and then shot multiple times into the clubhouse).

Defendant appears to argue that firing at least six shots at a group of people in rival gang territory cannot establish the requisite intent for murder. The Eighth Circuit rejected a similar argument in applying the attempted murder guideline:

> Williams [the defendant] argues that he lacked an intent to kill because he had no motive and no specific target within the crowd. However, the court could infer an intent to kill from William's firing seven gunshots at a crowd that included rival gang affiliates.

*United States v. Williams*, 583 Fed.Appx. 585, 585 (8th Cir. Nov. 19, 2014) (per curiam).[5] In *Bradford*, the Sixth Circuit stated: "We have previously found a specific intent to kill could be inferred from a defendant firing a gun aimed at an individual. … And we have cited approvingly another circuit's conclusion that specific intent to kill could be inferred from a defendant firing at a group of individuals." 822 Fed. Appx. at 339 (citations omitted); *see also United States v. Murillo*, 526 Fed.Appx 192, 195-96 (3rd Cir. 2013) (finding no clear error in the determination that shooting at a group of people showed an intent to kill); *Wilson*, 992 F.2d at 158 (affirming a sentence based on an attempted-murder cross-reference where the defendant shot at a group of people). Defendant and his cohorts drove to rival gang territory, pulled over near a group of people, and Defendant then fired multiple shots at the group. Defendant's act of shooting at these people in rival gang territory supports a premeditated intent to kill. *See also Turnipseed*, 2022 WL 3754708 at *4 (finding the necessary intent for an attempted murder where the defendant pulled out a handgun and fired multiple shots at a rival gang member); *United States v.*

---

[5] *See also United States v. Beachem*, 2021 WL 1085603 at *8-9 (N.D.Ind. Mar. 19, 2021) (intent to kill found in case in which gang members, who boasted about targeting rival gang members for violence in rap videos, traveled to a rival gang area and then opened fire at individuals that they encountered in rival territory).

7

*Grant*, 15 F.4th 452, 458 (6th Cir. 2021) (finding intent for attempted murder where defendant aimed the gun in victim's direction and fired).

Based on this attempted murder, Defendant is subject to an adjusted offense level 33. After acceptance, Defendant's incarceration range is 97 to 121 months. *See* PSR at ¶¶ 84-103; 139. As discussed above, the Government recommends a sentence of 97 months.

**The Danger Posed by Defendant and NOB to the Community**

The circumstances of the May 2018 attempted murder and shooting alone merit the sentence proposed by the Government. However, any argument for a lower sentence is rebutted not only by the circumstances of the shooting, but also by Defendant's other actions in support of NOB and its criminal activities. As set forth in the PSR, Defendant was actively involved in various gang-related crimes and supported other NOB members/associates in their criminal activities. For example,

1. Defendant was contacted by NOB member Kelvin "Kal" Barros following an attempted murder in Stoughton on August 12, 2018 (three months after Defendant committed his shooting), and Barros sought Defendant's assistance in recovering a vehicle which had been used in the Stoughton attempted murder [*see* PSR at ¶¶ 20-29];

2. Prior to another gang-related attempted murder on November 21, 2018, in New Bedford, NOB member Wilson "Dub" Goncalves-Mendes sent an image of the victim (who was subsequently shot multiple times) to Defendant [*see* PSR at ¶¶ 30-35];

3. On September 13, 2019, Defendant and NOB member Ricky Pina planned the targeting and robbery of a drug source. Pina believed that the drug source had been

8

involved in an attack on a NOB gang associate. The planned robbery was gang-related and retaliatory. Defendant agreed to participate in it after Pina pointed out that retaliation was necessary [*see* PSR at ¶¶ 36-37];

4. On October 28, 2019, Defendant, and two other NOB members/associates (including David Rodriguez – who is discussed below), responded to NOB gang members Michael Brandao and Tyrone Meek being confronted by rival gang members at a state courthouse and engaged in a physical confrontation with the rival gang members at the courthouse [*see* PSR at ¶ 58]; and

5. Defendant was involved in drug trafficking (particularly marijuana) with various NOB members/associates. As one aspect of his trafficking activities, Defendant was identified in recorded jail calls aiding NOB member Ricky Pina with Pina's drug distribution network when Pina was arrested in 2019. Defendant worked to support ensure that Pina's network did not fail due to Pina's incarceration. Similarly, when Defendant was arrested in October 2019, other NOB members/associates, including Anthony Depina and co-defendant Michael Brandao sought to support Defendant by recovering drugs and other contraband from Defendant's residence [*see* PSR at 38-40; 44-45; 54; 62-63].

In addition to the gang-related crimes noted above, Defendant was recorded in a series of jail calls with NOB associate David Rodriguez and NOB member Ricky Pina discussing raising money for Rodriguez's legal defense and associated costs while Rodriguez was facing state homicide charges for a shooting murder that took place on a public street in Dorchester in February 2020. In the jail calls, Defendant noted that NOB members/associates were pooling

9

money for Rodriguez, including the proceeds from illegal drug trafficking. Defendant further identified that supporting Rodriguez was required as it would be expected for any NOB member/associate charged with such a crime.[6]

The members/associates of NOB were empowered to commit a myriad of crimes *because* they supported each other through the criminal organization. A member/associate of NOB was well aware that he had the backing of fellow gang members/associates, like Defendant, in the commission of crimes and protection from other rival criminals. Defendant's support of NOB (and the concomitant support of the other members/associates) facilitated the gang's myriad of crimes. Thus, the criminal activities and impact of the NOB gang on the community should be considered in rebuttal of any argument for a sentence lower than the applicable Guidelines in this case. As set forth in the PSR and Exhibits 1 and 2, NOB's activities harmed various people over a period of years. Impacted people involved those who were targeted for gang violence, those who were affected by the gang's drug trafficking, and those who were exploited through the gang's prostitution activities. The harm caused by NOB also included the harms and burdens imposed on the families of NOB's victims.

NOB's activities also negatively impacted various communities through violence and drug abuse, particularly the Dorchester area of Boston. As to the harm caused by the gang's drug trafficking, the investigation identified that NOB was involved in the distribution of fentanyl, a highly dangerous and addictive drug, along with marijuana, cocaine base and cocaine. Some of the fentanyl distributed by the gang was pressed into pills and manufactured to appear

---

[6] The provision of money to incarcerated NOB members/associates by other members/associates (including money for bail and canteen money) was identified in other instances in the investigation.

like blue oxycodone pills – fentanyl is a more potent opioid than oxycodone. The fentanyl (and other drugs like cocaine base) distributed by the gang placed users at danger, destroyed families and degraded communities. As an example of the damage caused by the gang's drug distribution, in recovered text messages from co-defendant Samael Mathieu's mobile phone, Mathieu and his trafficking group (which included NOB members/associates Kelvin Barros and Delven Carvalho-Centeio) distributed fentanyl and other drugs throughout numerous communities south of Boston as well as throughout several communities on Cape Cod – areas significantly impacted by illegal drugs. The communities in which NOB distributed drugs were victimized by Defendant and his fellow gang members/associates through the range of harms caused by drug abuse.

     Similarly, NOB's violent crimes had a significant, deleterious impact on various communities, especially Dorchester. As discussed above, Defendant and other NOB gang members/associates were involved in several public shootings and other acts of violence (such as armed robberies) that injured not only the targets of these acts, but also victimized the families of the targets and the communities in which they occurred. Public violence (such as shootings) inevitably places innocent bystanders at risk as well as degrading the lives of people living in the community who daily face the specter of random violence on their streets and near their homes. NOB's violence caused these harms directly and precipitated the same types of harms from retaliatory violence by rival criminals/gangs. For example, (1) in August 2019, Defendant was present at a family party in Quincy, with several other people, when the house was shot up in gang-related shooting and two people were seriously wounded [*see* PSR at ¶ 59]; and (2) in May 2020, Defendant and other individuals (including multiple co-defendants) were shot at multiple

times while they stood outside of Defendant's Dorchester residence; co-defendant Michael Brandao returned fire with a pistol that he was carrying [*see* PSR at ¶¶ 46-49]. Both these shootings put innocent bystanders at risk and degraded the safety of these residential neighborhoods. These two incidents are just links in the ongoing chain of violence and harm generated by NOB's various criminal activities. The myriad of harms caused by the actions of NOB members/associates undercut any claim for a reduced sentence by Defendant because they are the intended product of the violent criminal organization that Defendant willfully joined and actively supported.

A significant sentence is warranted to both punish and deter Defendant and to deter those who would join and support similar criminal gangs. Gangs like NOB cannot be allowed to thrive as their existence inherently threatens the safety of the public. People who seek to raise families and live quietly in the community should not be held hostage to the threats and random violence of gang members/associates like Defendant and his cohorts in NOB. The dangerous activities in which Defendant personally engaged and for which Defendant was an ardent supporter as a member of NOB merit a lengthy sentence. The Government's proposed sentence of 97 months' incarceration to be followed by 3 years of supervised release is an appropriate sentence for all the reasons set forth in 18 U.S.C. 3553.

                                                              Respectfully submitted,

                                                              JOSHUA S. LEVY
                                                              First Assistant United States Attorney

Date: September 15, 2022                  By: */s/ Michael J. Crowley*
                                                             MICHAEL CROWLEY
                                                              SARAH HOEFLE
                                                               Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

    I, Michael J. Crowley, Assistant United States Attorney, do hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

                                                  */s/ Michael J. Crowley*
                                                  MICHAEL J. CROWLEY
                                                  Assistant U.S. Attorney